**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **DAWN MARIE HERROLD[1],** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 14 C 1142** |
| **v.** | ) | |
| | ) | **Magistrate Judge Michael T. Mason** |
| **CAROLYN W. COLVIN, Acting** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OPINION AND ORDER**

Michael T. Mason, United States Magistrate Judge:

Presently before this Court is plaintiff Dawn Marie Herrold's ("Herrold" or

"claimant") motion for summary judgment seeking judicial review of the final decision of

the Commissioner of Social Security (the "Commissioner").  The Commissioner denied

her claim for disability insurance benefits under Sections 216(i) and 223(d) of the Social

Security Act ("the Act"), 42 U.S.C. §§ 416 and 423.  The Commissioner filed a cross

motion for summary judgment asking this Court to uphold the decision of the

Administrative Law Judge ("ALJ").  This Court has jurisdiction to hear this matter

pursuant to 42 U.S.C. § 405(g).  For the reasons set forth below, claimant's motion for

summary judgment is granted and the Commissioner's motion is denied.

**I.     BACKGROUND**

**A.     Procedural History**

Herrold filed her application for disability insurance benefits on August 11, 2011,

alleging a disability beginning on September 10, 2010.  (R. 23.)  Claimant identified her

---

[1] Formerly Dawn Marie Peebles

disabling conditions as fibromyalgia, asthma, arthritis, thyroid disease, and hernia repair.  (R. 149.)  Claimant's application was denied administratively on November 4, 2011, and upon reconsideration on February 8, 2012.  (R. 90.)  She filed a timely request for an administrative hearing, and on September 7, 2012, claimant appeared with counsel via video teleconference before ALJ Daniel Dadabo.  (R. 54, 56, 58.)  On November 19, 2012, the ALJ issued a decision denying Herrold's claim for benefits.  (R. 20.)  Claimant filed a timely request for review.  (R. 15.)  The Appeals Council denied that request, and the ALJ's decision became a final decision.  Claimant then sought judicial review of the ALJ's decision, and filed this action in the District Court.

## B.  Medical Evidence

### 1.  Treating Physicians

Between February and March 2010, Herrold saw Dr. Palmer Blakley four times for pressure on her chest.  (R. 255, 257, 259, 345.)  On February 23, 2010, Dr. Blakley noted that there was no sign of active chest disease.  (R. 345.)   On September 12, 2010, another physician, Dr. Charles Beck, examined claimant.  He noted that Herrold was a "perennial asthmatic," and stated that her symptoms included pain, dyspnea, and discomfort increasing in the right chest.  (R. 214.)  Her CT scan showed bilateral sub-segmental atelectasis, and after a test for pulmonary function, his impression was that Herrold had a "very modest obstructive ventilator defect."  (R. 224.)  On September 22, 2010, Dr. Beck opined that claimant had pericardial fluid, which causes her "a little discomfort."  (R. 213.)  He was able to reproduce pain with his finger which he said could be fibromyalgia.  (R. 213.)

On September 23, 2010, Dr. Miranda Huffman noted that Herrold suffered from pain in multiple joint sites, which is likely caused by fibromyalgia. (R. 249.) She further noted that she had a normal gait and station, with no tenderness, no decreased range of motion, no instability, and no abnormal strength. (R. 249.)

Herrold saw Dr. Suman Seita on November 2, 2010. (R. 322.) Dr. Seita noted that Herrold had pain all over her body, that she rated her pain as a 10 of 10. (R. 322.) She had more pain in her low back and in both knees, and she has had this for 5 years. (*Id.*) Dr. Seita noted that Herrold also feels that her knees are giving out on her and she has difficulty lifting her arms. (*Id.*) She rated her knee strength at 4 out of 5. (R. 323.) Her neurological assessment revealed numbness and tingling in both hands, and her functional mobility was limited. (*Id*). She had difficulty walking and reaching overhead. (*Id.*) Dr. Seita stated that Herrold agreed to undergo physical therapy, but that she has poor tolerance for the exercises. (R. 324.)

Her physical therapist, Charmaine F. Boncalon, saw Herrold in November of 2010. (R. 321.) Herrold told Ms. Boncalon that she had bad cramps at night after doing her exercises, but she has an increasing tolerance for the exercises. (*Id.*) Claimant also had tingling on both hands when doing exercises. (*Id.*) Ms. Boncalon noted that Herrold tolerated her physical therapy treatment well with slight increase in leg pain. (*Id.*)

Dr. Seita diagnosed Herrold with fibromyalgia and stated that she was in so much pain after she did an exercise, she could not sleep even if she already took her prescribed pain pill. (R. 291.) She also had "lots of cramping," and when she is not doing anything at home, she feels better. (*Id.*) Once she starts moving or walking, she

has more pain.  (*Id.*)  Dr. Seita stated that with certain stretches, she had cramps, but the cramps were relieved with other stretches that caused tingling in her left foot.  (*Id.*) She continued to have pain with walking, reaching, and bed mobility.  (*Id.*)

A physical therapy progress report dated December 21, 2010 stated that Herrold's complaints included increased pain when moving around, and her functional limitations included pain when walking, reaching, and bed mobility.  (R. 319.)  A subsequent medical report, dated August 19, 2011, identified Herrold's fibromyalgia as being chronic in nature.  (R. 241.)  Herrold's other "major problems" were identified in a September 15, 2011 medical record as hypothyroidism and asthma allergic rhinitis, and her "other problems" were unspecified chest pain and esophageal reflux.  (R. 236.)  At the time, she was taking 10 different medications on a daily basis.  (R. 238, 240.)

On October 25, 2011, Dr. Humaira Khan reported that Herrold has muscle aches, muscle weakness, athralgias/joint pain, and back pain attributable to her fibromyalgia. (R. 389.)  On November 11, 2011, Dr. Khan noted that claimant's  fibromyalgia prognosis was unpredictable and could last at least twelve months.  (R. 377.)  Her symptoms were listed as multiple tender points, non-restorative sleep, chronic fatigue, morning stiffness, muscle weakness, frequent severe headaches, and anxiety.  (*Id.*) Emotional factors also contributed to the severity of her symptoms and functional limitations.  (*Id.*)  Her pain was in her cervical spine; right and left shoulders; right, left, and bilateral arms; and right, left, and bilateral knees, ankles, and feet.  (R. 378.)  Her pain was constant, but changing weather, fatigue, movement, overuse, cold temperatures, stress, and static position are factors that precipitate the pain.  (*Id.*)

Dr. Khan noted that Herrold can walk one block without rest or severe pain.  (*Id*)

She can sit for 20 minutes and stand for 15 minutes before needing to get up or sit down.  (*Id.*)  Additionally, with normal breaks, she can sit, stand or walk for less than two hours total in an 8-hour working day.  (*Id.*)  Dr. Khan wrote that claimant requires a job that permits shifting positions at will from sitting, standing, or walking, and that should include walking around every 20 minutes during the 8-hour work day.  (*Id.*)  Dr. Khan stated that Herrold will sometimes need to take unscheduled breaks every 45 minutes during the work day, and during that break, she will need to sit quietly.  (*Id.*)  With prolonged sitting, her legs need to be elevated at a 90-degree angle.  (R. 379.)

Dr. Khan further noted that Herrold can rarely twist, stoop/bend, crouch/squat, climb ladders, climb stairs, look down, or turn her head.  (R. 379.)  Claimant can only hold her head in a static position occasionally.  (*Id.*)  During an 8-hour work day, she can use her hands, fingers, or arms 25 percent of the time for grasping, turning, or twisting objects; she can also manage fine manipulations of her fingers; or reaching in front of the body and overhead.  (R. 380.)  Dr. Khan estimated that Herrold is likely to be off task such that it would interfere with her attention and concentration for 25 percent or more of the work day, and she is capable only of low stress work.  (Id.)  Dr. Khan noted that Herrold's condition is likely to produce good days and bad days, which will cause her to be absent from work more than 4 days per month.  (*Id.*)  These symptoms and limitations first appeared as early as 1 year ago.  (*Id.*)

On April 2, 2012, Dr. Mihaela Mihailescu, a rheumatologist, examined claimant. She noted "minimal joint space narrowing involving proximal interphalangeal joints of both hands… Osseous alignment is maintained without acute fracture of dislocation." (*Id.*)  Her impression was that claimant was experiencing "mild degenerative

changes…without acute osseous abnormality." (*Id.*)

On April 30, 2012, claimant reported to Dr. Mihailescu that her pain was everywhere and that it was all the time. (R. 436.) She rated both her pain and her fatigue at a 10 out of 10. (R. 437.) She reported pain in her arms and knees and difficulty standing. (R. 438.) Her physical examination noted normal expansion in the chest and clear auscultation in the lungs. (*Id.*) The examination also reflected all over fibromyalgia tender points but nothing else notable. (R. 439.)

On June 28, 2012, Dr. Mihailescu noted that claimant's fibromyalgia was active. (R. 439.) Claimant reported that her hip pain was constant and she rated it a 6 out of 10. (R. 430.) She complained of fatigue, dizziness, shortness of breath, difficulty sleeping, memory loss, joint pain and stiffness, back pain and muscle pain. (Id.) She also complained of tenderness all over her body. (R. 433.) She was prescribed physical therapy.

During this time, claimant also suffered from leiomyoma of the uterus and ovarian cysts. (R. 462.) A report dated June 18, 2012 noted claimant's "long history of uterine fibroids." (R. 468.) She ultimately had a hysterectomy in August of 2012. (*Id.*)

## 2. Agency Consultant

Dr. Dennis Malecki examined Herrold on October 18, 2011. (R. 331.) His clinical impression was that claimant suffers from fibromyalgia and asthma. (R. 335.) Herrold's past medical history indicated that she suffered from asthma, hypothyroidism, gastroesophogeal reflux disease (GERD), and fibromyalgia. (R. 332.) She had two prior surgeries, a cholecystectomy and an umbilical hernia repair. (*Id.*) She also had an

additional hospitalization for an asthma attack.  (*Id.*)

Dr. Malecki's report also stated that claimant alleges disability due to fibromyalgia.  (R. 331.)  Claimant stated that she has had constant and unrelenting pain and stiffness in her muscles since 2010.  (*Id.*)  The pain is in her neck, back, upper arms, and lower extremities, particularly in her elbows, knees, and lower back.  (*Id.*)  She is uncomfortable at rest, but physical activity increases her discomfort.  (*Id.*)  Repetitive activities increase the pain even more.  (*Id.*)  She reported that her pain is a 6 or 7 out of 10 but that it increases to a 10 of 10 with physical activity.  (*Id.*)

In terms of her daily activities, Herrold told Dr. Malecki that she can bathe, dress, and cook, but she performs these with difficulty.  (*Id.*)  She can go grocery shopping and travel, but she limits her travel to 20 minutes because of the discomfort she feels when she is in one position.  (*Id.*)  Claimant stated that she is able to do paperwork and pay bills, but has to do these with breaks, because of pain and cramping in her hands.  (*Id.*)  She can sit for 20 minutes and stand for 10-15 minutes.  (*Id.*)  She stated that she can walk on a level surface for 1-2 blocks and can carry approximately ten pounds.  (*Id.*)  She is able to do her household chores, but she does only one chore per day.  (*Id.*)  She limits her physical activity and takes frequent breaks.  (R. 331.)

During the exam, Dr. Malecki observed that Herrold expressed discomfort almost continuously, and especially with physical activity, changing positions, moving her head, and moving her arms or legs.  (R. 332.)  He noted that she has a full range of motion at the elbows and wrists, but at the shoulders, abduction was limited bilaterally to 90 degrees.  (R. 333.)  Herrold stated she was unable to raise her arms further because of discomfort.  (*Id.*)  She experienced no joint inflammation, effusion, or deformity, but

there was tenderness to palpation over all muscle groups. (*Id.*) In the lower extremities, Dr. Malecki observed that she has a full range of motion in the hips, knees, and ankles bilaterally. (R. 334.) In her back and spine, she had a full range of motion, with tenderness over the paravertebral muscles and trapezius muscles noted. (*Id.*) Claimant experienced discomfort with all range of motion in her lumbar spine. (*Id.*)

Dr. Malecki noted that claimant had moderate difficulty getting on and off the examination table and squatting. (*Id.*) She was unable to heel walk, and showed moderately severe unsteadiness with tandem gait. (*Id.*) She was able to squat to a degree of knee flexion of 80 degrees, but sitting and standing were otherwise unremarkable. (*Id.*) Claimant was able to briefly balance on a single leg and bear weight bilaterally, but she experienced significant difficulty with her left leg. (*Id.*)

Additionally, Dr. Malecki noted no atrophy of the hand musculature, and her hand grasp was symmetrical yet slightly decreased at 4/5 bilaterally. (*Id.*) She could make a fist and fully extend her fingers bilaterally, and could oppose her fingers to his thumb bilaterally. (*Id.*) Dr. Malecki observed that claimant is alert and oriented to time, place, and person, and her recent and remote memory are intact. (R. 335.) During the examination, claimant displayed a normal range of comprehension, reasoning, and concentration. (*Id.*)

### B. Claimant's Testimony

On September 7, 2012, claimant appeared with counsel before the ALJ. (R. 58.) The Vocational Expert, Brian Harmon ("the VE"), was also present at the hearing. (*Id.*) Claimant was 49 years old at the time of the hearing. (R. 60.) She currently lives with her son and her husband, to whom she had just recently married. (R. 65.) She was

living with her 18-year-old son when she applied for disability. (R. 65, 66.) She has a high school education. (R. 80.)

She testified she has been seeing Dr. Khan for a year and a half. (R. 60.) She has also been seeing Dr. Mihailescu, her rheumatologist, for five to six months. (R. 60.) Claimant testified that in 2009, she was laid off from her job as a loan processor. (R. 61.) At that time, her fibromyalgia had not yet become an issue. (R. 61.) In September 2010, the fibromyalgia became an issue for her, and she believed that had she still been employed at that time, the fibromyalgia would have kept her from working because she experienced such intense pain all over her body. (R. 62.) During this time, it became very difficult for her to handle tasks at home, so she knew she would not be able to work. (*Id.*)

Claimant testified that she did some physical therapy in 2010, but she stopped. (R. 61.) She stated that her gynecologist, Dr. James, had recommended that she wait until after her hysterectomy to continue with her physical therapy. (*Id.*)

Claimant also testified that her problems have become increasingly worse. (*Id.*) While on her prescription medications, her average daily pain is a 6 or 7 out of 10. (R. 68, 69.) She experiences this pain 3 or 4 times per week for, on average, 4 to 6 hours. (R. 72.) Her knees ache all the time, her muscles hurt, and she feels weak. (R. 67.) If she moves the wrong way, it feels as though something is tearing in her shoulders; it is a sharp pain. (R. 68.) After twenty minutes, she experiences "very intense pain" in her knees and back, which gets worse the longer that she sits or stands. (R. 64.) Sometimes the pain is in her hip, ankles, wrists, fingers, or the tips of her fingers. (R. 68.) Every day, there is pain in a different spot, but her back and knee pain is constant.

9

(*Id.*)  Her sleep is interrupted because of cramps in her legs.  (*Id.*)  The longest she can do an activity before having to rest is 20 minutes because she gets very tired and fatigued.  (R. 64.)  When she puts her legs up, it eases her knee and back pain.  (*Id.*)

Claimant testified that she usually gets up around 8:00 am and her whole body aches and feels stiff.  (R. 62.)  She then takes care of her dogs.  (*Id.*)  She sits in a chair in the family room to "kind of get unstiff."  (*Id.*)  Then, she makes coffee and watches television.  (*Id.*)  She testified it takes her an hour before she starts feeling able to walk around.  (*Id.*)  Between 10:00 am and 11:00 am, she sits at her computer, or pays her bills.  (*Id.*)  Between 12:00 pm and 1:00 pm, she takes a shower, makes her bed, and goes back to watching television.  (R. 62-63.)  All the while, her back, knees, and arms hurt her.  (R. 63.)  She occasionally grocery shops in the afternoon, and after she returns home, she puts her groceries away, and watches television again until 5:30 or 6:00 pm.  (*Id.*)  She cooks dinner, which is difficult for her, because it hurts her arms to stir on the stove.  (*Id.*)  After she finishes cooking, she rests the remainder of the night. (*Id.*)  The next day, she washes the dishes because she is exhausted by the time she finishes cooking.  (*Id.*)  On some days, she tries to do light cleaning, such as vacuuming, cleaning the bathroom, and laundry.  (*Id.*)

Throughout the day, she gets up every 20 minutes to walk around and stretch her legs, and she elevates her legs 8 times a day for 15 to 20 minutes at a time.  (R. 63, 71.)  If she is already standing, she has to sit down every 10 to 15 minutes for 5 minutes at a time.  (R. 71, 72.)  Her pain intensifies the longer that she sits, stands, and walks. (R. 77.)

On days when her symptoms are not as bad, Herrold drives to the mall about 10

to 15 miles away from her home once or twice a month; this is the furthest she travels from her home.  (R. 64-65.)  These trips usually last up to two hours.  (R. 65.)  When her symptoms are more severe, she stays home and rests in her lounge chair with her legs up.  (*Id.*)  She does not need help with dressing or hygiene, but her son helps her with the chores.  (R. 67.)

The ALJ asked claimant to explain why, with this level of discomfort, it will be difficult for her to do her old jobs.  (R. 69.)  She testified that it is hard for her to sit for long periods, and when reaching for the phone or files she has no grip.  (R. 69.)  Her hands ache when she grabs items, and she drops objects.  (R. 69.)  She stated, "everything just aches, just feels heavy... even picking up something light to me is very heavy, and it hurts, intensifies, it goes up my arm."  (R. 69.)  She estimated that in an 8-hour period, she would last 2 hours using her hands to grip and type.  (R. 75.)  Also, she could only be on her feet standing and walking for 1 hour throughout the day.  (R. 76.)  She cannot concentrate for more than 15 to 20 minutes before she becomes "off focus" and "forgetful."  (R. 75-76.)

Herrold's counsel asked her to explain how much work she would have to miss at her old job.  (R. 72.)  Before her fibromyalgia became an issue for her, she was very busy with work and was always moving, typing, faxing, using the phone, copying, reaching for files, reaching for a stapler, and using the computer.  (R. 73.)  She was also able to sit at her desk for 3 to 4 hours at a time without moving, getting up, or taking a break.  (*Id.*)  She replied that now she would have missed at least 2 or 3 days a week, depending on the week.  (R. 72.)

Herrold also stated that she has trouble breathing and contracted respiratory

infections from the paper, dust, cologne, and perfume at her work. (R. 73.) She uses an inhaler and a puffer, but does not use a nebulizer. (R. 74.) She experiences dizziness for 2 hours of the day, and for 15 to 20 minutes at a time. (R. 75.) She says she sits down and then feels okay. (*Id.*) In the past, she took Meclizine for the dizziness, but the medicine made her sick. (*Id.*)

### C. Vocational Expert's Testimony

The VE testified that Herrold's work as a loan processor over the past 15 years would best be characterized as a mortgage loan processor. (R. 80.) The Dictionary of Occupational Titles ("DOT") lists this position at the sedentary exertional level. (*Id.*) Claimant performed the job at the light exertion level. (*Id.*) Herrold's particular job has an SVP of 5, which is skilled, and means that the individual needs to do the job at least one to two years to become proficient. (*Id.*) The VE testified that Herrold does not have any additional education or preparation that would allow for direct entry to skilled work or a skilled position. (*Id.*)

The ALJ reported that the state agency found Herrold, despite her impairment, able to do light work subject to occasional postural limitations. (R. 81.) "Postural" pertains to actions such as balancing, stooping, crouching, kneeling, crawling, climbing ladders, and ascending ramps and stairs. (*Id.*) For manipulative limitations, the state restricted her overhead reaching to occasional. (*Id.*) For environmental limitations, the state restricted excessive, dust, fumes, odors, or temperature extremes. (*Id.*) The VE testified that if the state findings represent the most that Herrold can do, she would be able to go back to her work as a loan processor. (*Id.*) Other available jobs include a telephone answering service operator, code 235.662-026; registration clerk, code

205.362-042; and credit card clerk, code 209.587-014. (R. 82.) These are available in the region, and all are at the sedentary exertion level with a SVP of 3. (R. 81-82.) All three of the jobs require very good use of the hands. (R. 85.) The VE also recommended those jobs that are considered semi-skilled work, because claimant has transferrable work skills, identified by DI-25015.015. (R. 83.)

Additionally, the VE testified that a person who is absent 2 days a week, or approximately eight days per month, is going to have excessive absenteeism. (R. 84.) In his experience, the acceptable threshold for working in competitive employment, or that for which claimant is qualified, is one day per month. (*Id.*) Any more absences would preclude her employment. (*Id.*) In these types of positions, individuals need to be alert and on-task at least 85 percent of the day, and any less would preclude employment. (*Id.*) Thus, if an individual has to take an unscheduled break every 20 minutes, it is unlikely that the individual is going to consistently meet the 85 percent threshold. (R. 85.) Similarly, if an individual has to elevate her legs approximately 8 times a day, it would preclude competitive employment. (R. 85-86.) If, for example, she elevated her legs outside of one of the scheduled breaks for 15 to 20 minutes, during the portion of the day when she was expected to be on-task, the action would preclude her from competitive employment. (R. 86.) For a new employer, it would require an accommodation not normally extended. (*Id.*) Therefore, there is no work for an individual who could sit less than 2 hours in an 8-hour work day, and stand or walk less than 2 hours in an 8-hour workday. (R. 87.) In other words, an individual limited to only 4 hours of work in a workday would be precluded from employment. (*Id.*)

## II.  LEGAL ANALYSIS

## A. Standard of Review

This Court will affirm the ALJ's decision if it is supported by substantial evidence and free from legal error.  42 U.S.C. § 405(g); *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).  Substantial evidence is more than a scintilla of evidence; it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Diaz v. Chater*, 55 F.3d 300, 305 (7th Cir. 1995) (*quoting Richardson v. Perales*, 402 U.S. 389, 401 (1971)).  We must consider the entire administrative record, but will not "re-weigh evidence, resolve conflicts, decide questions of credibility, or substitute our own judgment for that of the Commissioner."  *Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003) (*citing Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000)).  This Court will "conduct a critical review of the evidence" and will not let the Commissioner's decision stand "if it lacks evidentiary support or an adequate discussion of the issues." *Lopez*, 336 F.3d at 539 (*quoting Steele*, 290 F.3d at 940).

In addition, while the ALJ "is not required to address every piece of evidence," she "must build an accurate and logical bridge from the evidence to [her] conclusion." *Clifford*, 227 F.3d at 872.  The ALJ must "sufficiently articulate her assessment of the evidence to assure us that the ALJ considered the important evidence ... [and to enable] us to trace the path of the ALJ's reasoning."  *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993) (*quoting Stephens v. Heckler*, 766 F.2d 284, 287 (7th Cir. 1985)).

## B. Analysis Under the Social Security Act

To be entitled to disability insurance benefits, a claimant must establish that he or she is "disabled" under sections 216(i) and 223(d) of the Social Security Act.  A person is disabled under the Act if "he or she has an inability to engage in any substantial

gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 423(d)(1)(A).

In determining whether a claimant is disabled, the ALJ must consider the following five-step inquiry: (1) whether the claimant is currently employed, (2) whether the claimant has a severe impairment, (3) whether the claimant's impairment is one that the Commissioner considers conclusively disabling, (4) if the claimant does not have a conclusively disabling impairment, whether he can perform his past relevant work, and (5) whether the claimant is capable of performing any work in the national economy. *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001).  Claimant has the burden of establishing a disability at steps one through four.  *Zurawski v. Halter*, 245 F.3d 881, 885-86 (7th Cir. 2001).  If the claimant reaches step five, the burden then shifts to the Commissioner to show that "the claimant is capable of performing work in the national economy."  *Id.* at 886.

Here, at step one, the ALJ determined that claimant had not engaged in substantial gainful activity since September 10, 2010, the alleged onset date of her disability.  (R. 24.)  At step two, the ALJ found that claimant had the following severe impairments: fibromyalgia and asthma.  (R. 25.)  The ALJ determined that these impairments were severe because they cause more than a minimum impact on functioning.  (R. 25.)  At step three, the ALJ determined that claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (R. 26.)  20 C.F.R. 404.1520(d); 20 C.F.R. 404.1525; 20 C.F.R. 404.1526.

Before moving to step four, the ALJ must first determine claimant's residual functional capacity or "RFC". An individual's RFC is her ability to do physical and mental work activities on a sustained basis despite limitations from her impairments. In making this finding, the ALJ must consider all of claimant's impairments, including those that are not severe. 20 C.F.R. 404.1520(e); 20 C.F.R. 404.1545; SSR 96-8p. At step four, the ALJ found that claimant has the RFC to perform light work as defined in 20 C.F.R. 404.1567(b), subject to only occasional ramps or stairs, occasional ladders, ropes and scaffolds, occasional balancing, stooping, crouching, crawling and kneeling, and no excessive dust, fumes, odors, or temperature extremes. (R. 26.) Last, at step five, the ALJ found that claimant is capable of performing her past relevant work as a mortgage loan processor, DOT 249.362-022. (R. 29.) He determined that this work does not require the performance of work-related activities precluded by claimant's RFC, 20 C.F.R. 404.1565. (R. 29.)

Claimant now argues that her case should be remanded on four grounds: (1) the ALJ's discussion of whether claimant met or equaled a listing was impermissibly cursory; (2) the ALJ improperly assessed claimant's credibility when he determined that her statements concerning her symptoms were inconsistent with the assessed RFC; (3) the ALJ assessed claimant's RFC incorrectly; and (4) the Appeals Council erred in rejecting new and material evidence that claimant submitted after the hearing. We address each of claimant's arguments below.

### 1. The ALJ's Discussion of the Listings Does Not Require Remand

Claimant first argues that the ALJ failed to properly consider whether claimant met or equaled Listing 14.09 at step three of the disability analysis. At step three of the

ALJ's analysis, "evidence demonstrating the claimant's impairments is compared to a list of impairments presumed severe enough to preclude any gainful work." *Rice v. Barnhart*, 384 F.3d 363, 365 (7th Cir. 2004). In order for a claimant's impairment to meet a listing, all specified medical criteria must be satisfied. *Maggard v. Apfel*, 167 F.3d 376, 380 (7th Cir. 1999). An ALJ should mention by name the specific listings he is considering. *Ribaudo v. Barnhart*, 458 F.3d 580, 583 (7th Cir. 2006). His failure to mention the specific listings at step three, when combined with a "perfunctory analysis," requires remand. *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004); *Brindisi ex rel. Brindisi v. Barnhart*, 315 F.3d 783, 786 (7th Cir. 2003); *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).

Here, at step three, the ALJ only included one sentence in his analysis. He stated: "[Claimant's] asthma does not correspond to the specific medical requirements of Listings 3.02 and 3.03, and has not eventuated in emergency room treatment or hospitalization." (R. 26.) The ALJ never identified Listing 14.09, which is the listing associated with fibromyalgia. (*Id.*) However, remand is not automatic where the ALJ's consideration of the listing criteria is apparent from the entirety of his opinion. *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004); *Ahmad v. Colvin*, 2016 WL 98567, at *10 (N.D. Ill. Jan. 8, 2016) ("nor must a court discount a discussion that provides the necessary detail to review the ALJ's step 3 determination in a meaningful way solely because it appears in a later section of the ALJ's decision."); *see also Rice*, 384 F.3d at 369-70 (declining to remand where there was discussion of the listing in the record); *Zatz v. Astrue*, 346 Fed. App'x 107, 110 (7th Cir. 2009) (declining automatic remand based on the presence of listing consideration elsewhere in the record).

17

After our review of the ALJ's opinion, although he did not mention the listing associated with fibromyalgia, we are satisfied that he adequately considered claimant's fibromyalgia, the evidence supporting her limitations, and the criteria for meeting this listing. (R. 27-28.) The ALJ noted that Dr. Mihailuscu was the physician primarily treating claimant's fibromyalgia and that her treatment notes consisted mostly of a recitation of claimant's subjective complaints. (R 28.) The ALJ also noted that Dr. Mihailescu's medical observations were "intermittent" and included ambiguous observations about claimant's limitations. (*Id.*) The ALJ stated that Dr. Khan's objective findings regarding claimant's fibromyalgia symptoms were also not remarkable. (*Id.*) Therefore, we are satisfied that the ALJ's opinion adequately discusses the criteria in Listing 14.09. While we agree with claimant that it would have been better had the ALJ specifically included this discussion in his step-three analysis, because the relevant evidence was discussed elsewhere in this opinion, this is not grounds for remand. *Ahmad*, 2016 WL 98567, at *10 ("while the ALJ did omit any reference to any of the 14.00 Listings in his step three discussion, it is clear from the remainder of his opinion that the ALJ considered the plaintiff's impairments…, noting that they did constitute severe impairments and discussing their effects at length in assessing plaintiff's RFC.").

Similarly, Herrold argues that the ALJ's step three analysis regarding Listings 3.02 and 3.03, which relate to her asthma, was too cursory. Listing 3.02 applies to "chronic pulmonary insufficiency," which requires "chronic obstructive pulmonary disease", "chronic restrictive ventilator disease," or "chronic impairment of gas exchange due to clinically documented pulmonary disease." 20 C.F.R. Pt. 404, Subpt.

18

P, App. 1, § 3.02.  Listing 3.03 applies to "asthma," but requires chronic asthmatic bronchitis or attacks that occur at least every two months or six times of year which require physician intervention.   20 C.F.R. Pt. 404, Subpt. P, App. 1, § 3.03. Alternatively, an in-patient hospitalization for longer than 24 hours for the control of asthma counts as two attacks.  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 3.03.  The ALJ pointed out that claimant last saw a pulmonologist in September of 2010 and at that time, it was noted that she had a "very modest obstructive ventilator defect."  (R. 29.) The ALJ also noted that her attacks have "not eventuated in emergency room treatment or hospitalization."  (R. 26.)  Again some of this discussion was noted elsewhere in the ALJ's decision, but regardless, we are satisfied that the ALJ's discussion of the criteria for these listings was sufficient.  *Rice*, 384 F.3d at 369-70; *Ahmad*, 2016 WL 98567, at *10.

Next, claimant argues that her November 2, 2010 and November 14, 2011 examination results were not mentioned in the listing analysis and that these records favor allowance of her disability claim.  Remand is required where the ALJ failed to acknowledge parts of the record that could in fact meet or equal a particular listing. *Minnick v. Colvin*, 775 F.3d 929, 935-36 (7th Cir. 2015); *Kastner v. Astrue*, 697 F.3d 642, 647-48 (7th Cir. 2007).  However, the ALJ is not required to discuss every piece of evidence.  *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009).  The ALJ need only support his determinations with substantial evidence, and if he does so, this Court will not displace the ALJ's judgment by reconsidering facts or evidence.  *Id*; *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007).

We have reviewed these two records and we are not convinced that these

records should have necessarily been included in the ALJ's step-three analysis. The first is a physical therapy report from 2010, in which it is noted that claimant has trouble with walking, bed mobility and reaching overhead. (R. 323.) The second is a medical report, in which Dr. Khan noted that everything about claimant's range of motion was normal, her strength was between a 3/5 and a 4/5, and her reflexes, sensory examination, and coordination, station and gait were also normal. (R. 397.) Neither of these records establishes that the listings criteria for either impairment was met. As we noted above, the ALJ did generally address Dr. Khan's notes regarding claimant's fibromyalgia and he found that these notes did not establish that the listings criteria were met. Because the ALJ is not required to discuss every piece of evidence in the record, it is not imperative that these particular records be included in the listings analysis. Therefore, we disagree with claimant's argument that the ALJ's omission of these two records requires remand.

### 2. The ALJ Failed to Consider Certain Evidence in His Credibility Analysis

Claimant also argues that the ALJ's credibility determination was erroneous and requires remand. As an initial matter, we note that the SSA has recently updated its guidance about evaluating symptoms in disability claims. *See* SSR 16-3p, 2016 WL 1119029 (effective March 28, 2016). The new ruling eliminates the term "credibility" from the SSA's sub-regulatory policies to "clarify that subjective symptom evaluation is not an examination of the individual's character." *Id.* at *1. Though SSR 16-3p post-dates the ALJ's hearing in this case, the application of a new social security regulation to matters on appeal is appropriate where the new regulation is a clarification

of, rather than a change to, existing law. *Pope v. Shalala*, 998 F.2d 473, 482-483 (7th Cir. 1993). In determining whether a new rule constitutes a clarification or a change, courts give "great weight" to the stated "intent and interpretation of the promulgating agency." *Id.* at 483. Though a statement of intent is not dispositive, the courts defer to an agency's expressed intent to "clarify" a regulation "unless the prior interpretation…is patently inconsistent with the later one." *Id.*; *see also First Nat. Bank of Chicago v. Standard Bank and Trust*, 172 F.3d 472, 479 (7th Cir. 1999); *Homemakers North Shore, Inc. v. Bowen*, 832 F.2d 408 (7th Cir. 1987).

Here, the SSA has specified in its new SSR that its elimination of the term "credibility" in subjective symptom evaluation is intended to "clarify" its application of existing rules and to "more closely follow our regulatory language regarding symptom evaluation." SSR 16-3p, 2016 WL 1119029 at *1. Moreover, the two SSRs are not patently inconsistent. Indeed, a comparison of the two reveals substantial consistency, both in the two-step process to be followed and in the factors to be considered in determining the intensity and persistence of a party's symptoms. *Compare* SSR 16-3p and SSR 96-7p. Stated differently, "[t]he agency has had only one position, although it has expressed that position in different words." *Homemakers N. Shore, Inc.*, 832 F.2d at 413. Therefore, it is appropriate to evaluate claimant's credibility argument in light of the guidance the Administration has provided in SSR 16-3.

It remains the case that because the ALJ is in the best position to determine a witness's truthfulness and forthrightness, courts afford the ALJ's credibility determinations special deference. *Nelson v. Apfel*, 131 F.3d 1228, 1237 (7th Cir. 1997). In assessing an ALJ's credibility determination, this Court will not undertake a de novo

review of the medical evidence.  *Elder v. Astrue*, 529 F.3d 408, 413-14 (7th Cir. 2008).

Instead, this Court will affirm the ALJ's determination if it was reasoned and supported

by the record.  *Skarbek v. Barnhart*, 390 F.3d 500, 505 (7th Cir. 2004).  The court will

not overturn an ALJ's credibility determination unless it is "patently wrong."  *Shideler v.

Astrue*, 688 F.3d 306, 310-11 (7th Cir. 2012).

Under SSR 16-3, the ALJ must still consider all of an individual's symptoms,

including pain, and the extent to which the symptoms can reasonably be accepted as

consistent with the objective medical and other evidence in the record.  In assessing

symptoms, the ALJ should consider elements such as "objective medical evidence of

the impairments, the daily activities, allegations of pain and aggravating factors,

functional limitations, and treatment (including medication)."  *Prochaska v. Barnhart*,

454 F.3d 731, 737 (7th Cir. 2006); SSR 16-3, 2016 WL 1119029.

Turning to claimant's credibility argument here, she states that the ALJ

improperly discredited her testimony when fashioning the RFC.  The RFC must be

assessed based on all the relevant evidence in the record.  20 C.F.R. § 404.1545(a)(1).

Claimant again argues that the ALJ improperly ignored two reports that would support

her limitations - the 2010 physical therapy report and the 2011 record from Dr. Khan -

which we addressed above.  As we discussed, neither of these records presents a

compelling case for debilitating fibromyalgia and as we explained, the ALJ is not

required to address every page in the record.  Here, the ALJ did acknowledge that there

were some treatment notes in the record which were contrary to the ALJ's ultimate

conclusion, but the ALJ explained why he chose to disregard this evidence.  He also

noted that Dr. Khan was not primarily treating claimant's fibromyalgia.

In addition, Herrold criticizes the ALJ's use of "boilerplate" language when assessing her credibility. However, the inclusion of boilerplate language is not grounds for reversal when the ALJ otherwise adequately explains his conclusion. *Filus v. Astrue*, 694 F.3d 863, 868 (7th Cir. 2012); *Pepper v. Colvin*, 712 F.3d 351, 367-68 (7th Cir. 2013); *Shideler v. Astrue*, 688 F.3d 308, 312 (7th Cir. 2012). Remand is only warranted when the ALJ's determination lacks any explanation or is otherwise "patently wrong." *Elder v. Astrue*, 529 F.3d 408, 413-14 (7th Cir. 2008).

Here, we agree with the Commissioner that the boilerplate language does not require remand because the ALJ included additional discussion to support his credibility finding. (R. 26-29.) The ALJ considered claimant's "all over" body pain and other symptoms and its effects on her daily activities. (R. 27.) He also considered that the longest she can persist with any activity due to her pain and fatigue is 20 minutes. (*Id.*) He acknowledged that she would need to change positions to relieve discomfort 8-12 times a day, and is unable to concentrate due to discomfort. (*Id.*) However, he determined that the assessment of claimant's rheumatologist was only supported claimant's subjective complaints that her pain was constant and worsened with movement. (R. 27.) The ALJ noted that Dr. Mihailescu's reports were somewhat ambiguous and she failed to detail claimant's symptoms with any objective measures. (*Id.*) Further, there was no hair loss or thinning associated with autoimmune disease and Dr. Mihailescu considered her fibromyalgia to be stable. (R. 27.) Dr. Mihailescu also wrote that she did not plan on doing anything more than a medication change and prescribing aerobic exercises. (R. 28.)

The ALJ also considered that in May of 2011, claimant told Dr. Khan that her

fibromyalgia discomfort was overwhelming, but as of August 2011, Dr. Khan recorded full joint range of motion, no tenderness, and preserved motor strength. (*Id.*) He noted that when Dr. Khan made the original fibromyalgia diagnosis, he observed a "normal gait and station, no misalignment, no asymmetry, crepitus, defects, tenderness, masses or effusion; no instability, no non-use atrophy, no abnormal muscle tone, no decrease in range of motion or decrease in strength." (R. 28-29.)

However, the ALJ also discredited claimant's testimony based on her failure to continue with her physical therapy sessions. (R. 28.) The ALJ stated that she unilaterally stopped physical therapy after only four sessions, and concluded that "[f]our sessions of physical therapy two years ago in combination with prescribed medication does not appear to correspond with greater limitation than the undersigned has inferred." (*Id.*) In her medical records, however, there is evidence that she suffered from uterine leiomyoma and ovarian cysts, and in her testimony, claimant noted that her gynecologist told her not to undergo any physical therapy until after her hysterectomy. (R. 61.) Based on these facts, claimant argues that the ALJ improperly discredited her without considering her explanation for failing to undergo additional physical therapy. In response, the Commissioner argues that the gynecologist's recommendation "pertained to a discrete time period and does not explain her noncompliance for the entire period of time."

We agree with claimant that the ALJ should have considered her explanation when he discredited her for failing to continue with her physical therapy. SSR 96–7p prohibits an ALJ from drawing negative inferences about a claimant's failure to seek treatment without first considering explanations for the failure. *See Myles v. Astrue,* 582

F.3d 672, 677 (7th Cir. 2009) (remanding where the ALJ failed to consider claimant's explanations for lack of treatment). While it is true that her hysterectomy did not happen until August of 2012, and therefore, it is unlikely that her gynecologist's recommendation was the reason she stopped physical therapy in early 2011, we are not in a position to read in to the ALJ's decision or to make conclusions for him. *See Moss v. Astrue,* 555 F.3d 556, 564 (7th Cir. 2009) ("while infrequent treatment or failure to follow a treatment plan can support an adverse credibility finding, we have emphasized that the ALJ must not draw any inferences about a claimant's condition from this failure unless the ALJ has explored the claimant's explanations as to the lack of medical care."). For this reason, the case should be remanded to the ALJ for further proceedings. On remand, the ALJ should note claimant's explanation regarding her failure to undergo additional physical therapy and should determine whether the objective evidence in the record supports this explanation.

We do not opine on whether claimant's testimony was credible, only that the ALJ's finding lacked the appropriate consideration of why she discontinued her physical therapy treatment, in light of her medical records and her gynecologist's recommendations. The ALJ's failure to adequately articulate the reasoning for her credibility finding in light of this evidence warrants remand.

### 3. The ALJ's RFC Assessment

Claimant next argues that the ALJ failed to consider all of her impairments in combination in assessing her RFC. Specifically, claimant asserts that the ALJ failed to consider her testimony that she needed to elevate her legs half the time and the

testimony about her reduced range of motion in her shoulders and her grasp strength. She also points to the VE's testimony that she would be unemployable because of the amount of time she would need to rest or be off task.

In determining a claimant's RFC, the ALJ must evaluate all limitations that arise from medically determinable impairments - even those that are not severe - and may not dismiss a line of evidence that is contrary to his ruling. SSR 96-8p. Because we have already determined that a remand is appropriate here, we do not need to address at length claimant's argument regarding the ALJ's RFC determination. On remand, the ALJ should be careful to consider all of the evidence in making his or her RFC assessment, including the testimony noted above.

### 4. Claimant's Claim Regarding New and Material Evidence

Lastly, claimant argues that the results of her October 12, 2012 scan were new and material evidence relevant to whether her asthma met a listing. The Appeals Council failed to consider it, and claimant argues this failure warrants remand. The scan showed reactive lymph nodes, bilateral ground glass lung opacities, and anterior pericardial fluid. (R. 560-66.) It showed no evidence of pulmonary embolism or aortic aneurysm and bilateral pneumonitis with reactive adenopathy. (R. 560-61.) At that scan, she was diagnosed with bronchitis and discharged. (R. 561.)

The Appeals Council determined that this scan was not "new and material evidence," and thus, this Court's jurisdiction is only to review that conclusion for legal error. *Stepp v. Colvin*, 795 F.3d 711, 722 (7th Cir. 2015). Evidence is new if it was "not in existence or available to the claimant at the time of the administrative proceeding."

26

*Schmidt v. Barnhart*, 395 F.3d 737, 742 (7th Cir. 2005) (*quoting Perkins v. Chater*, 107 F.3d 1290, 1296 (7th Cir. 1997)). Then, evidence is "material" if there is a "reasonable probability" that the ALJ would have reached a different conclusion had the evidence been considered. *Schmidt v. Barnhart*, 395 F.3d 737, 742 (7th Cir. 2005) (*citing Johnson v. Apfel*, 191 F.3d 770, 776 (7th Cir. 1999)).

Because we have already determined that a remand is necessary to address previously discussed problems with the ALJ's opinion, we do not need to address this final issue in great detail. On remand, the ALJ should carefully consider the results of the October 12, 2012 scan in his or her analysis.

## III. Conclusion

For the reasons set forth above, Herrold's motion for summary judgment is granted in part and the Commissioner's motion for summary judgment is denied. This case is remanded to the Social Security Administration for further proceedings consistent with this Opinion. It is so ordered.

**Dated: April 27, 2016**

**MICHAEL T. MASON**
**United States Magistrate Judge**